Submitted September 17, combined peremptory writ and appellate judgment to issue forthwith; ORAP 9.25, providing for petitions for reconsideration, waived on the court's own motion September 22, 2004

Sandra KUCERA,
an elector of Oregon and candidate for
Vice President of the United States,
Sarah Therese Winder, Kristen Zubel, and Natalie Bolton,
each an elector of Oregon and signer of petition
for nomination of Ralph Nader for President
of the United States and
Sandra Kucera as Vice President
of the United States and
as a circulator of said nominating petition,
Phillip Salisbury and Samantha Berg,
each an elector of and signer of a petition
for nomination of Ralph Nader for President
of the United States and
Sandra Kucera as Vice President of the United States,
Timothy Johnson,
a circulator of said nominating petition
who is not an elector of Oregon,
Gregory Kafoury,
an individual, an elector of Oregon and Co-Chair,
Nader for President 2004 in Oregon,
*Plaintiffs-Adverse Parties,*

*v.*

Bill BRADBURY,
Secretary of State,
*Defendant-Relator,*
*and*

DEMOCRATIC PARTY OF OREGON,
John Neel Pender
and James Edmunson,
*Intervenors Below.*

(CC 04C18259; SC S51756)

97 P3d 1191

Kaye E. McDonald, Assistant Attorney General, Salem, filed the petition and supplemental memorandum for defendant-relator. With her on the petition and memoranda were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Daniel W. Meek, Portland, filed the memorandum in opposition for plaintiffs-adverse parties.

Margaret Olney, Smith, Diamond & Olney, Portland, filed the memorandum for *amici curiae* Service Employees International Union and Oregon Education Association.

DURHAM, J.

## DURHAM, J.

Oregon's Secretary of State Bill Bradbury seeks a writ of mandamus from this court requiring Judge Lipscomb of the Marion County Circuit Court to vacate an order that he entered in the underlying proceeding, which we describe below in detail. The order required the Secretary of State to certify the nomination of Ralph Nader as an independent candidate on Oregon's November 2, 2004, general election ballot. For the reasons set out below, we direct that a peremptory writ of mandamus issue requiring the trial court to withdraw that order.

### THE NADER CAMPAIGN'S PETITION
### FOR NOMINATION BY INDIVIDUAL ELECTORS

Oregon law provides for the nomination of candidates for partisan public office by a major political party, ORS 249.078, a minor political party, an assembly of electors, or individual electors, ORS 249.705. ORS 249.740 describes the procedure for nomination of candidates by individual electors:

"(1) A certificate of nomination made by individual electors shall contain a number of signatures of electors in the electoral district equal to not less than one percent of the total votes cast in the electoral district for which the nomination is intended to be made, for all candidates for presidential electors at the last general election.

"(2) Each elector signing a certificate of nomination made by individual electors shall include the residence mailing address of the elector. Except for a certificate of nomination of candidates for electors of President and Vice President of the United States, a certificate of nomination made by individual electors shall contain the name of only one candidate.

"(3) Before beginning to circulate the certificate of nomination, the chief sponsor of the certificate shall file a signed copy of the prospective certificate with the filing officer referred to in ORS 249.722. The chief sponsor of the certificate shall include with the prospective certificate a statement declaring whether one or more persons will be paid money or other valuable consideration for obtaining

signatures of electors on the certificate. After the prospective certificate is filed, the chief sponsor shall notify the filing officer not later than the 10th day after the chief sponsor first has knowledge or should have had knowledge that:

"(a)   Any person is being paid for obtaining signatures, when the statement included with the prospective certificate declared that no such person would be paid.

"(b)   No person is being paid for obtaining signatures, when the statement included with the prospective certificate declared that one or more such persons would be paid.

"(4)   The circulator shall certify on each signature sheet that the individuals signed the sheet in the presence of the circulator and that the circulator believes each individual is an elector registered in the electoral district.

"(5)   The signatures contained in each certificate of nomination made by individual electors shall be certified for genuineness by the county clerk under ORS 249.008.

"(6)   As used in this section, 'prospective certificate' means the information, except signatures and other identification of certificate signers, required to be contained in a completed certificate of nomination."

Under ORS 249.740(5), the county clerk must certify for genuineness the signatures of electors in the county that accompany the certificate of nomination by individual electors. ORS 249.008 requires the county clerk of each county, before the filing of the certificate of nomination by individual electors, to verify the elector signatures and to certify the number of signatures believed to be genuine. ORS 249.008 provides, in part:

"(1)   Except as provided in subsection (2) of this section, before a nominating petition, minutes of an assembly of electors, or petition by individual electors is offered for filing, the county clerk of each county in which the signatures were secured shall compare the signatures of electors on the petition or minutes with the signatures of the electors on the elector registration cards. Any petition or minutes submitted for verification under this section shall contain only original signatures. The county clerk shall attach to the petition or minutes a certificate stating the number of signatures believed to be genuine. The certificate is prima facie evidence of the facts stated in it. A signature

not included in the number certified to be genuine shall not be counted by the officer with whom the petition is filed. No signature in violation of the provisions of this chapter shall be counted.

"(2)  If the total number of signatures presented to a county clerk for verification is 15,000 or more, the county clerk may use a statistical sampling technique authorized by the Secretary of State to verify the signatures. The sample shall be drawn from at least 100 percent of the number of signatures required for nomination."

ORS 249.009(1) authorizes the Secretary of State to adopt administrative rules prescribing the form of certificates of nomination by individual electors and a system for numbering all signature sheets of certificates for nomination by individual electors.

"The Secretary of State by rule shall:

"(a)  Design the form of nominating or recall petitions, certificates of nomination by individual electors, minutes of an assembly of electors or minor political party formation petitions; and

"(b)  Prescribe a system for numbering all signature sheets of nominating or recall petitions, certificates of nomination by individual electors, minutes of an assembly of electors or minor political party formation petitions."

The Secretary of State has exercised the authority that ORS 249.009(1) grants by designating as an administrative rule the "2004 State Candidate's Manual: Individual Electors" (SCMIE). OAR 165-010-0005(5). We discuss below in greater detail the rules that the SCMIE contains.

Plaintiffs are supporters of a campaign (the "Nader campaign") that seeks to nominate Ralph Nader and Sandra Kucera as President and Vice President, respectively, of the United States on the November 2, 2004, Oregon general election ballot through the nomination by individual electors procedure described in ORS 249.740. According to the record, ORS 249.740(1) obligated the Nader campaign to file not less than 15,306 signatures of Oregon electors with its certificate of nomination by individual electors under ORS 249.740(1). However, the Secretary of State determined that numerous

signature sheets that the Nader campaign filed with its certificate of nomination contained errors in the certification or dating of the sheets by circulators or in the numbering of the sheets by Nader campaign representatives. In addition, a number of county clerks, acting on instructions from the Secretary of State, declined to verify elector signatures on sheets that reflected errors that the Secretary of State identified. In some cases, they removed the noncomplying signature sheets from the group of signatures certified for genuineness under ORS 249.740(5). Plaintiffs do not agree that the asserted errors in the signature sheets exist or, if they do exist, that they affect the validity of the elector signatures or the certificate of nomination by individual electors.

Due to his conclusion that numerous signature sheets did not comply with applicable legal requirements, the Secretary of State declined to count the elector signatures on the noncomplying signature sheets in determining whether sufficient valid elector signatures supported the certificate of nomination. On September 2, 2004, the Secretary of State notified Nader that his campaign had submitted 15,088 qualified signatures, which was 218 signatures short of the required number. The Secretary of State advised Nader, "Consequently, there are not sufficient qualified signatures for you to gain ballot access for this office."

## PLAINTIFFS' LEGAL ACTION

On September 3, 2004, plaintiffs filed in Marion County Circuit Court an appeal of the action of the Secretary of State under ORS 246.910[1] and a petition for review of

---

[1] ORS 246.910 provides:

"(1) A person adversely affected by *any act or failure to act by the Secretary of State*, a county clerk, a city elections officer or any other county, city or district official under any election law, or by *any order, rule, directive or instruction made by the Secretary of State*, a county clerk, a city elections officer or any other county, city or district official *under any election law*, may appeal therefrom to the circuit court for the county in which the act or failure to act occurred or in which the order, rule, directive or instruction was made.

"(2) Any party to the appeal proceedings in the circuit court under subsection (1) of this section may appeal from the decision of the circuit court to the Court of Appeals.

"(3) The circuit courts and Court of Appeals, in their discretion, may give such precedence on their dockets to appeals under this section as the circumstances may require.

administrative action under ORS 183.484.[2] Plaintiffs alleged eight claims for relief. We summarize those claims for relief, because they are relevant to our disposition here.

The first claim for relief alleged that the Secretary of State's "decision to reject the nominating petitions was not accompanied by any findings of fact or conclusions of law sufficient to enable Plaintiffs (or anyone) to determine the reasons for the rejection" and that "[s]uch deficiency renders the decision unlawful."

The second claim for relief alleged that the Secretary of State "has apparently rejected over 3,000 valid and verified voter signatures" due to "some errors" committed by persons who circulated signature sheets or by the Nader campaign. Plaintiffs alleged that the refusal of the Secretary of State to count those signatures "is beyond his authority, is arbitrary and capricious, and is otherwise unlawful."

The third claim for relief alleged that the Secretary of State had rejected signature sheets "containing in the range of 2,000 valid and verified voter signatures on the ground that the sheets, as submitted to the Secretary of State, were not sequentially numbered." Plaintiffs asserted that the Nader campaign had complied with applicable requirements for numbering sheets and that the Secretary of State's action was unlawful.

The fourth claim for relief alleged that the Secretary of State had rejected signature sheets containing "in the range of 700 valid and verified voter signatures on the

---

"(4) The remedy provided in this section is cumulative and does not exclude any other remedy against any act or failure to act by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law or against any order, rule, directive or instruction made by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law."

(Emphasis added.)

[2] ORS 183.484(1) provides:

"Jurisdiction for judicial review of orders other than contested cases is conferred upon the Circuit Court for Marion County and upon the circuit court for the county in which the petitioner resides or has a principal business office. Proceedings for review under this section shall be instituted by filing a petition in the Circuit Court for Marion County or the circuit court for the county in which the petitioner resides or has a principal business office."

ground that the sheets display some defect in the signature of the circulator or the date on the signature of the circulator." Plaintiffs asserted that the Secretary of State had "not stated which signature sheets were rejected for these reasons" and "has not stated the reason for the rejection of any signature sheet * * *." Plaintiffs alleged that the Secretary of State's rejection of signature sheets due to the appearance of or date pertaining to a circulator's signature was unlawful.

The fifth claim for relief alleged that the Secretary of State's implementation of a rule that disqualified voter signatures on a nominating petition on the basis of alleged or proven errors by petition circulators, in signing, dating, or placing numbers on the sheets, violated the First and Fifth Amendments to the United States Constitution.[3]

The sixth claim for relief alleged that the Secretary of State's implementation of a rule that disqualified voter signatures on a nominating petition on the basis of alleged or proven errors by petition circulators—in signing, dating, or placing numbers on the sheets with no opportunity for administrative cure of alleged defects—violated Article I, sections 8 and 20, and Article II, section 1, of the Oregon Constitution.[4]

---

[3] The First Amendment to the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The Fifth Amendment to the United States Constitution provides:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

[4] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

Article I, section 20, of the Oregon Constitution provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

The seventh claim for relief alleged that the Secretary of State's implementation of a rule that disqualified a circulator's signature if it varied from the signature on the circulator's Oregon voter registration card discriminated against Oregon voters who are not registered to vote and violated the First Amendment right of plaintiffs to travel across state lines into Oregon to engage in core political speech and to circulate petition sheets.

Plaintiffs' eighth claim for relief sought reasonable attorney fees and costs for the action. Plaintiffs also requested declaratory and injunctive relief nullifying the Secretary of State's action.

Along with their complaint, plaintiffs filed a motion for preliminary injunction requiring the Secretary of State "to certify the Nader/Kucera ticket for the 2004 general election ballot * * *." Plaintiffs supported the motion with affidavits from several circulators of the certificate of nomination signature sheets.

## THE TRIAL COURT PROCEEDING

The case came before the trial court on September 8, 2004, on plaintiffs' motion for preliminary injunction. The court granted the motion of the Democratic Party of Oregon and two of its officers to intervene in support of the Secretary of State. The court denied a request by Service Employees International Union (SEIU) to intervene as a party, but allowed SEIU to appear as *amicus curiae.* The parties stipulated that the court could combine the hearing on the motion for preliminary injunction, including live testimony, affidavits, and all arguments, with a trial on the merits.

On September 9, 2004, the court filed its opinion and order, which we discuss below in greater detail. In the opinion, the court reviewed the pertinent statutes and administrative rules governing nominations by individual electors and focused its analysis on plaintiffs' fourth claim for relief, described above.

---

Article II, section 1, of the Oregon Constitution provides: "All elections shall be free and equal."

The court concluded that the Secretary of State had no authority, under applicable statutes and rules, to instruct county clerks to screen signature sheets for various problems related to the signature of the circulator and the date of the circulator's signature. Those problems included the action of some circulators in certifying the signature sheets with the signer's initials or to cross out or attempt to modify the date of the circulator's certification. The court also concluded that the Secretary of State's instructions to county clerks to screen elector signature sheets for circulator signature and dating problems before verifying the elector signatures were inconsistent with ORS 247.005,[5] with the Secretary of State's written rules in the SCMIE, and "with the Secretary's policy position set out in *Nelson v. Keisling*[, 155 Or App 388, 964 P2d 284 (1998), *rev den*, 328 Or 246 (1999)]." We analyze those bases for the court's conclusion below.

Ultimately, the court concluded that the Secretary of State had exceeded his authority by (1) instructing county clerks not to verify elector signatures if the signature sheets displayed circulator certification problems; and (2) disapproving elector signature sheets that county clerks had certified if the signature sheets displayed similar circulator certification problems.

The court rejected plaintiffs' third claim for relief, which alleged that the Secretary of State had exceeded his authority in rejecting signature sheets that had not been numbered sequentially. The court did not address or resolve other claims for relief in its order and opinion.

On September 13, 2004, the court entered a general judgment that stated:

"This case came before the Court upon plaintiffs' Motion for a Preliminary Injunction and heard on September 8, 2004. By stipulation of the parties, the request for preliminary relief was combined with trial on the merits, including live testimony, testimony by affidavits, oral argument and

[5] ORS 247.005 provides:

"It is the policy of this state that all election laws and procedures shall be established and construed to assist the elector in the exercise of the right of franchise."

extensive legal briefing by the parties, including inter-venor-defendant, Democratic Party of Oregon. The Court issued its Order and Opinion dated September 9, 2004 with regard to plaintiffs' third and fourth claims for relief as set forth in said opinion and order, and finding that its ruling on the fourth claim for relief is dispositive of the merits without reaching constitutional claims, now enters judgment as follows:

"Now, hereby, it is ORDERED and ADJUDGED:

"1.   Defendant Secretary of State is hereby ordered to certify the results of the nominating petitions of Ralph Nader and Sandra Kucera for independent candidate to the appropriate elections authorities and to order the preparation of ballots for President and Vice-President for the 2004 General Election which contain the names of Ralph Nader and Sandra Kucera as independent candidates for President and Vice-President.

"2.   Plaintiffs are entitled to recover their costs and disbursements incurred herein."

POST-JUDGMENT PROCEEDINGS

The Secretary of State filed his petition for writ of mandamus on September 15, 2004. With the petition, he also filed an emergency motion requesting expedited review of the petition and a decision from this court by September 22, 2004, if possible, so that elections officials could proceed with the printing of accurate ballots for the November 2, 2004, general election.

On September 16, 2004, this court allowed the motion to expedite review and set an accelerated briefing schedule. In addition, this court allowed a motion by SEIU and the Oregon Education Association to appear as *amici curiae*. The parties filed their briefs and excerpts of record on September 17, 2004, and the court took the petition under advisement. The court expresses its appreciation to counsel for all parties and *amici curiae* for their cooperation and prompt submission of materials to the court in this case.[6]

---

[6] In addition to this mandamus proceeding, the Secretary of State filed an appeal from the trial court's general judgment. On September 16, 2004, the Court of Appeals entered an order certifying the appeal to this court under ORS 19.405 and ORAP 10.10. On the same day, this court accepted the certification.

## MANDAMUS IS AN APPROPRIATE REMEDY

Plaintiffs assert that mandamus is not an appropriate remedy in the circumstances. We disagree. The Secretary of State has a strong interest in a prompt resolution through this mandamus proceeding of plaintiffs' challenge to his authority to reject the certificate of nomination by individual electors filed by the Nader campaign. The petition seeks the determination of questions of law regarding the authority of the Secretary of State, not to control discretionary determinations by the trial court, as plaintiffs argue. Without a prompt resolution of plaintiffs' challenge to the authority of the Secretary of State, the state's strong interest in the efficient administration of the November 2, 2004, general election will suffer irreparable injury. Under the circumstances, the Secretary of State's right to appeal from the trial court's judgment provides a remedy at law that is chimerical at best.

Plaintiffs further argue that this mandamus proceeding improperly seeks to resolve unadjudicated questions of fact. They contend, for example, that the Secretary of State was estopped from requiring the submission of sequentially numbered signature sheets to each county by reason of advice that the "appropriate person" in the Secretary of State's office had given to the Nader campaign. Additionally, plaintiffs argue that they asserted in the trial court the factual claim that the circulator signatures on a large number of rejected signature sheets were indeed authentic signatures. Again, we disagree.

Plaintiffs challenged several actions of the Secretary of State, including the application of administrative rules, the promulgation and application of written instructions and directives, and the determination that the Nader campaign had filed insufficient elector signatures to support a certificate of nomination by individual electors. Properly viewed, the issues in this mandamus proceeding concern a single legal question: Did Oregon law authorize the Secretary of State to take the actions that he took at the time he acted? As that question makes clear, the facts that are most pertinent to that inquiry are those that responsible elections officials knew or should have known when they acted. We turn now to the legal question stated above.

## AUTHORITY OF SECRETARY OF STATE TO DISQUALIFY ELECTOR SIGNATURES DUE TO VIOLATION OF CIRCULATOR SIGNATURE REQUIREMENTS

The premise for the trial court's decision was that no statute or rule expressly authorized the Secretary of State to prohibit the counting of otherwise valid signatures of electors that supported a certificate of nomination simply because of arguable violations of signature and dating requirements respecting circulators. The trial court also believed that disqualification of elector signatures was inconsistent with ORS 247.005 and with "the prior policy of the Elections Division," as recited in the Court of Appeals decision in *Nelson*. For the following reasons, we disagree with the trial court.

The legislature has acted in several ways to provide the procedures for nominating candidates by individual electors. First, the legislature has enacted ORS 249.740. Second, the legislature has adopted several statutes that delegate authority over that procedure, and other election procedures, to the Secretary of State. ORS 249.009(1), quoted above, is one example. In addition to authorizing rulemaking, the legislature has enacted ORS 246.110, which provides:

> "The Secretary of State is the chief elections officer of this state, and it is the secretary's responsibility to obtain and maintain uniformity in the application, operation and interpretation of the election laws."

The legislature also has enacted ORS 246.150, which provides:

> "The Secretary of State may adopt rules the secretary considers necessary to facilitate and assist in achieving and maintaining a maximum degree of correctness, impartiality and efficiency in administration of the election laws."

In addition to the foregoing authority, and to ensure that the Secretary of State carries out the responsibility described in ORS 246.110, the legislature has required the Secretary of State to communicate with each county clerk through written directives and other means on election procedures that are under the direction and control of the county clerk. ORS 246.120 provides:

"In carrying out the responsibility under ORS 246.110, the Secretary of State shall prepare and distribute to each county clerk detailed and comprehensive *written directives*, and shall *assist, advise and instruct* each county clerk, on registration of electors and election procedures which are under the direction and control of the county clerk. The directives and instructions shall include relevant sample forms of ballots, documents, records and other materials and supplies required by the election laws. A county clerk affected thereby shall comply with the directives or instructions."

(Emphasis added.)

As already noted, the Secretary of State exercised the rulemaking authority that ORS 249.009(1) delegates by adopting SCMIE as a rule. The record also demonstrates that the Secretary of State exercised his authority under ORS 246.120 by issuing written instructions to all county clerks regarding the verification of elector signature sheets from the Nader campaign, including directions for addressing potential problems with the signature and dating of signature sheets by circulators.[7] The written instructions to the county clerks from John W. Lindback, Director of the Elections Division for the office of Secretary of State, stated:

"Following are procedures we need all counties to follow when verifying the signature sheets for the Nader for President petition.

"1. Counties will initially screen for potential problems with circulator signature and dating of signature sheets.

"2. Counties will highlight with a highlighter the areas of concern on the signature sheet. **Do not** verify any signatures on the sheets that have any potential problems

---

[7] The record contains no evidence that any campaign other than the Nader campaign was employing the nomination procedure in ORS 249.740 at the time. That accounts for the reference to the Nader campaign in the written instructions now before us. We assume that the written instructions are applicable generally to all the elections procedures to which the Secretary of State has addressed them, not just to a single candidate or campaign, until the Secretary of State withdraws, modifies, or supercedes them. We note also that the candidate nominating process that is the subject of this case comprises a different set of statutes than those associated with ballot measures.

or issues. Once the Secretary of State's office makes a determination on these sheets, the county will be contacted and advised on whether to verify these signatures or to reject the sheet.

"3.   The areas to review for concern are:

"The circulator signature line is blank or the circulator has signed using initials only. (First name initial with the full last name is sufficient).

"There is no date on the circulator date signed line.

"Circulator date has been crossed out or modified.

"The circulator signed and dated **before** the dates of some or all of the the [*sic*] signers.

"Circulator name is a signature stamp.

"Circulator signature is photocopied or carbon copied.

"White out is used on the circulator name or date area.

"There are two **different** circulator names on the certification.

"The original signature of a circulator has been crossed out, and a new circulator's signature is inserted.

"4.   Once the counties have screened for these items the county will fax any sheets of concern to the Secretary of State Elections Division * * * [Elections Division officials] will make the final determination on these sheets.

"5.   Counties will retain and not return any signature sheets to the Nader Campaign that may have any potential problems until the Secretary of State has resolved these issues and notified the county.

"6.   On signature sheets that have no issues and appear to be sufficient, the counties will verify the signatures and cross through any blank signature lines on the signature sheets with a marker so that no other signers may be added to that sheet **after** the county has verified the sheets.

"7. Counties will verify all signatures submitted only on signature sheets that do not have any issues. The county will retain a copy of all signature sheets submitted and return the original sheets with the counties certification to the Nader Campaign."

(Boldface in original.)

Lindback explained by affidavit the circulator signature review procedures that his office followed in inspecting the signature sheets that the county elections officials submitted. According to Lindback, state officials accepted a circulator's signature if the signature sheet bore a mark that appeared to be that person's signature. However, they engaged in further review if the purported signature was illegible or appeared to consist only of initials. That further review sought to confirm that the mark was the circulator's valid signature. To that end, state officials compared the mark on the signature sheet with the signature on the circulator's voter registration card, if applicable, or another signature exemplar. Lindback stated:

"It bears emphasis that our practice is to accept a purported circulator's signature if there is any reasonable way to do so."

Lindback also described the procedures that his office followed to confirm compliance by circulators with the requirement that they state the date on which they certified each signature sheet. In general, state officials rejected signature sheets containing no date or alterations in the date, such as stricken material, but accepted signature sheets that the circulator had redated and re-signed or sheets that told a "clear story" about their completion and whose circulators apparently had completed the certification properly.

The trial court determined that the signature and date review procedures that Lindback had followed in his office were "unwritten rules," that they were "not supported by the written administrative rules as set forth in the Manual," that they were "inconsistent with ORS 247.005" and "the prior policy of the Elections Division" as stated in *Nelson*, and that they "were not applied either uniformly or consistently in actual practice."

It is true that the review procedures that Lindback described were not themselves written, but that does not render them unlawful. On the contrary, the review procedures are nothing more than the step-by-step process by which the Secretary of State carried out legal authority found elsewhere in statute, in rule, and in the Secretary of State's written instructions to the county clerks. The review procedures were not, as the trial court's comments appear to suggest, yet another layer of unannounced legal barriers. They were, instead, the methodology by which the Secretary of State enforced existing legal standards. Specifically, Lindback designed the review procedures as a means to carry out the Secretary of State's duty under ORS 246.110 to "obtain and maintain uniformity in the application, operation and interpretation of the election laws." The necessity for the review procedures arose in this case because the Secretary of State gave written instructions to the county clerks to return to the Secretary of State for further review all signature sheets "that have any potential problems or issues," and gave them a list of those potential problems. The review procedures that Lindback described did not enlarge upon the written list; rather, they merely effectuated it with the goal of insuring that review by his office was a uniform process. The trial court's concern in this respect was not well taken.

The trial court's criticism that the Secretary of State's review procedures were "not supported by the written administrative rules as set forth in the [SCMIE]" appears also to reflect a concern that the SCMIE provides that a signature sheet format violation "will result in the rejection of those sheets," but does not similarly warn of potential rejection of signature sheets for other errors, such as in the signature and dating of sheets by circulators. Relatedly, the trial court noted that the SCMIE warns that violation of the circulator certification requirements may result in conviction of a felony with a significant fine and imprisonment, but gives no notice that a violation of those requirements will lead to a disqualification of the elector signatures.

Those concerns of the trial judge also are not well taken. In practical terms, the trial court construed the SCMIE not to permit the sanction of disqualification of elector signatures due to circulator certification errors, because,

although the SCMIE mentioned other potential sanctions, it did not mention that particular sanction under these particular circumstances. But, when we consider the circulator certification rules in context, their silence about the possible effect of a violation on the validity of elector signatures is just that—silence. The notice in the rule that certain criminal consequences "may result" from a violation is a pointed warning to circulators, not an assurance to electors who sign the signature sheet that their signatures will count despite the circulator's improper certification.

It is important to remember that ORS 249.740(4) requires each circulator to *certify* on each signature sheet that the signer had signed the sheet in the circulator's presence and that the circulator believed that the signer was an elector registered in the electoral district. The term "certify" means "to attest esp. authoritatively or formally * * * to present in formal communication, esp. in a document under hand or seal * * *." *Webster's Third New Int'l Dictionary* 367 (unabridged ed 1993). In keeping with the legislature's requirement of a formal attestation, SCMIE requires the circulator to "sign" the signature sheet, and the Secretary of State's written instructions call for the use of a "signature." A "signature" is "the name of a person written with his own hand to signify that the writing which precedes accords with his wishes or intentions." *Id.* at 2116. Thus, for example, the Secretary of State logically could disqualify a mark that consisted of mere initials, because the mark fails to display the required signature. *See Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (sustaining "agency's plausible interpretation of its own rule").

■ In adopting the rules set out in the SCMIE, in issuing written instructions to the county clerks, and in utilizing the circulator signature and date review procedures, the Secretary of State was obtaining and maintaining uniformity in the operation of an election law, *i.e.*, the certification requirement in ORS 249.740(4), as ORS 246.110 required. The Secretary of State thus may conclude, and clearly has so concluded, that a circulator's failure to comply with the Secretary of State's requirements for circulator certification means that the purported certification is invalid and the signature sheet does not comply with ORS 249.740(4).

The trial court opined that there was no valid policy reason to enforce the circulator certification requirement by disqualifying the signature of an elector if the county clerk had been able to verify that the electors' signatures on the disqualified sheets were genuine. That overlooks the requirement in ORS 249.740(4) that the circulator must certify that the individual signed the sheet *in the presence of the circulator*. The bare presence of an elector's signature on a sheet is not enough to show compliance with that requirement. The certification requirement serves to discourage fraud in the execution of signature sheets. The Secretary of State's choice to invalidate a signature sheet if the circulator violates the certification requirement promotes that objective. The trial court's concerns in this respect were not legally justified.

We next note that the trial court's reliance on ORS 247.005 was misplaced. That statute is the legislature's statement of state policy to assist electors in the exercise of the franchise. It does not purport to invalidate rules and procedures that the Secretary of State lawfully adopts pursuant to statutory command or delegated authority. Were the rule otherwise, virtually any election law or rule would be vulnerable to invalidation under ORS 247.005. We decline to accord that intention to the legislature.

The trial court's reliance on *Nelson*, 155 Or App 388, also was misplaced. In *Nelson*, the Court of Appeals determined that a civil penalty of a $250 fine was the exclusive remedy for violation of an election statute, ORS 260.560, and that the legislature did not authorize the invalidation of signatures as an additional remedy. The court stated:

> "Neither ORS 260.560 nor OAR 165-014-0005 spells out the consequence for violating the requirement that petition circulators be Oregon registered voters. ORS 260.995, however, provides that the Secretary or the Attorney General may impose a civil penalty not to exceed $250
>
> " 'for each violation of any provision of Oregon Revised Statutes relating to the conduct of any election, any rule adopted by the Secretary of State under ORS chapters 246 to 260 or any other matter preliminary to or relating to an election, for which no penalty is otherwise provided.'

"There is no question that the civil penalty provision applies to violations of ORS 260.560 and OAR 165-014-0005 (1996). The question is whether that remedy is the exclusive remedy for violations of the statute and the rule. Certainly, nothing in the language of the statute suggests any legislative intention to make the civil fine cumulative of other remedies such as the invalidation of signatures. The legislature expressly has provided for invalidation of signatures upon violation of other statutes. *See, e.g.,* ORS 249.008(1) ('No signature in violation of the provisions of this chapter shall be counted.'); ORS 249.865(5) ('[a]ny intentional or willful violation [of the statute] shall invalidate the prospective petition'); ORS 250.105(2) (the Secretary shall not accept initiative or referendum petition if fewer than required number of signatures are submitted). The failure of the legislature to include similar language in its description of the consequences of violating ORS 260.560 strongly suggests that it did not intend invalidation of signatures to be a remedy for violating that statute."

*Id.* at 393-94. The trial court read *Nelson* to suggest that the legislature's decision not to state expressly in ORS 249.740(4) or elsewhere that a violation of circulator certification requirements would lead to the invalidation of signatures, as the legislature had so stated in ORS 249.008(1), meant that the legislature did not intend to authorize that remedy.

Even if *Nelson* correctly construed the contrast in the statutory texts that it considered—an issue that we need not decide here—that case is distinguishable. As we have explained elsewhere, the Secretary of State has determined, in the lawful exercise of delegated authority, that a circulator's violation of certification requirements deprives the affected signature sheet of the certification that ORS 249.740(4) requires. The Secretary of State's determination advances the legislature's objective of deterring fraud in the nomination process. *Nelson* did not address the legal effect of the Secretary of State's delegated authority to reach that determination and to adopt rules and procedures to deter fraud in the election system.

Finally, the trial court noted that some counties did not comply with the Secretary of State's written instruction to scrutinize signature sheets for circulator certification

problems. After those counties submitted their sheets of verified elector signatures, the Secretary of State's staff examined the signature sheets for the circulator certification problems that the counties had neglected to investigate. If the staff determined that the circulator certifications violated the Secretary of State's requirements, then staff did not count the elector signatures on the affected signature sheets. The trial court determined that "[t]here appears to be no statutory or administrative rule authority for that novel action by the Secretary at the post-verification stage" and that that action violated ORS 247.005.

■ The trial court acknowledged that Lindback had sought to justify that action by citing the Secretary of State's responsibility, expressed in ORS 246.110, "to obtain and maintain uniformity in the application, operation and interpretation of the election laws." We agree with Lindback's explanation. The noncompliance by several counties with the Secretary of State's written instructions, issued under the Secretary of State's express authority in ORS 246.120, threatened a violation of the uniform application of the Secretary of State's requirements for circulator certification. *See* ORS 246.120 ("A county clerk affected thereby shall comply with the [Secretary of State's] directives and instructions.") Faced with that potential violation of uniformity, the Secretary of State's choice to engage in a post-verification review of signature sheets from noncomplying counties was a permissible one. And, for the reasons already stated, the policy statement in ORS 247.005 does not undermine the Secretary of State's authority under ORS 246.110 to make that choice.

In light of the foregoing, we conclude, that the trial court impermissibly sustained plaintiff's fourth claim for relief. Plaintiffs argue, however, that the court should not grant a writ of mandamus because each of their other claims for relief would warrant the same injunctive relief that the trial court granted. Plaintiffs assert that the record demonstrates, as a matter of law, that plaintiffs are entitled to the same relief under each of those claims. We have considered plaintiffs' alternative theories, because, if one or more were correct, it would obviate the necessity of relief in mandamus.

Plaintiffs correctly identify their burden at this point respecting their other claims for relief. ORS 18.082(3) provides:

> "Upon entry of a general judgment, any claim in the action that is not decided by the general judgment or by a previous limited judgment, that has not been incorporated into the general judgment under subsection (2) of this section, or that cannot be decided by a supplemental judgment, is dismissed with prejudice unless the judgment provides that the dismissal is without prejudice."

Under that statute, the trial court's general judgment dismissed with prejudice all claims for relief except the fourth claim for relief that the court expressly sustained. Consequently, plaintiffs can prevail on their alternative arguments only if there is no evidence in the record to support the dismissal with prejudice of the remaining claims. We turn now to those claims.

## PLAINTIFFS' ALTERNATIVE ARGUMENTS

Plaintiffs assert in their first claim for relief that the Secretary of State, in notifying Nader that his campaign had filed insufficient signatures, failed to include with the decision any findings of fact or conclusions of law to explain the reasons for that action. Plaintiffs seek review of that notification under ORS 183.484 as an order in other than a contested case.

Plaintiffs' first claim relies on a misinterpretation of an agency's responsibility in issuing an order in other than a contested case. In that context, "nothing in the APA directs an agency in other than a contested case proceeding to make a record or to make findings of fact before issuing its order." *Norden v. Water Resources Dept.*, 329 Or 641, 647, 996 P2d 958 (2000). Under *Norden*, an agency's failure to incorporate findings of fact or conclusions of law into an order in other than a contested case to explain the basis for the order is not a violation of any law. Consequently, plaintiffs' first claim for relief fails.

Plaintiffs' second claim for relief asserts that the Secretary of State has no authority to refuse to recognize verified elector signatures on signature sheets that contain

errors committed by circulators or the Nader campaign. However, the claim rests on the same false premise that this court rejected above in discussing plaintiffs' fourth claim for relief. For the same reasons, plaintiffs' second claim for relief is not well taken.

Plaintiffs' third claim for relief challenges the Secretary of State's rejection of signature sheets that the Nader campaign submitted without sequential numbering. Plaintiffs contend, and the Secretary of State disputes, that the Nader campaign followed the instruction of elections officials in numbering submitted signature sheets. Plaintiffs argue that the Secretary of State is estopped to deny the advice that the Nader campaign received.

ORS 249.009(1)(b) authorizes the Secretary of State to adopt rules that "[p]rescribe a system for numbering all signature sheets of * * * certificates of nomination by individual electors * * *." The Secretary of State has exercised that authority by adopting the following rule in the SCMIE:

> "Before submitting the signature sheets to the appropriate county elections official for signature verification, the chief sponsor must * * * [w]ithin each individual county, sequentially number each signature sheet in the space provided; * * *"

Lindback explained that his office rejected the signature sheets in question because the Nader campaign had failed to number the sheets before submission to county election officials in violation of the rule.

As a general proposition, a governmental agency may be estopped from asserting a claim inconsistent with a previous position that it has taken. *Dept. of Transportation v. Hewitt Professional Group*, 321 Or 118, 126, 895 P2d 755 (1995). However, one element required for estoppel is reasonable reliance on a governmental actor's misstatements. Reliance on a misstatement is not reasonable if the governmental actor had no authority to make the misstatement. *Id.* The alleged misstatement on which plaintiffs rely would have had the effect of negating the administrative rule that the Secretary of State enforced. Nothing in the record demonstrates that any person who may have advised the Nader

campaign had (or indeed could have) any authority to negate a rule. Thus, any reliance on that statement, if made, was not reasonable. The third claim for relief is legally flawed for that reason.

Plaintiffs' fifth, sixth, and seventh claims for relief assert various constitutional challenges, which we summarized above, to the Secretary of State's disqualification of signature sheets due to errors by circulators in signing and dating the sheets. Plaintiffs contend that a compelling justification must support the state's enforcement of any rule that results in the disqualification of the signatures of registered voters.

We do not dispute that the statutory procedure for nomination by individual electors implicates important aspects of the political liberty and associational freedom of Oregon's electors. However, plaintiffs' claim that the Secretary of State's action effectively compels them to collect thousands of signatures in addition to the number required by Oregon statute or the state constitution is illusory. Plaintiffs, like all political participants, must collect only the number of signatures, and comply with the pertinent signature gathering procedures, that Oregon law requires. Thus, contrary to plaintiffs' argument, the Secretary of State has not imposed an undue burden on plaintiffs' political freedoms under the state or federal constitutions.[8]

The United States Supreme Court has noted, in an analogous context, that a state (there, Colorado) "retains an arsenal of safeguards" to protect the integrity of a ballot-initiative process, to deter fraud, and to diminish corruption. *Buckley v. American Constitutional Law Foundation, Inc.,* 525 US 182, 204-05, 119 S Ct 636, 142 L Ed 2d 599 (1999). The Court in *Buckley* specifically cited a state statute that invalidated an initiative "if [the] circulator has violated any provision of the laws governing circulation" as one example of a legitimate state safeguard. *Id.* at 205. The Court also noted that states "have considerable leeway to protect the integrity and reliability of the initiative process, as they have with

---

[8] Plaintiffs present no separate argument under the state constitution in this court.

respect to election processes generally," *id.* at 191, citing as an example Colorado's requirement that petition circulators attach to each petition section an affidavit containing particular factual statements.

We recognize, of course, that functional differences exist between the initiative process scrutinized in *Buckley* and the candidate nomination procedure under consideration here. But, as noted, the underlying signature collection and circulator certification procedures are analogous. For that reason, we conclude that, according to the principles discussed in *Buckley*, Oregon's circulator certification procedure, and the other procedures discussed above that protect the electoral process from fraud, withstand federal constitutional scrutiny. It follows from the foregoing that the Secretary of State's disqualification of signature sheets in this case is not unconstitutional for the reasons asserted by plaintiffs.

Plaintiffs' only remaining claim concerns attorney fees and costs. That claim affords no alternative basis for sustaining the action of the trial court.

## CONCLUSION

We conclude, for the reasons stated above, that the Secretary of State is entitled to relief from the order of the trial court that required the Secretary of State "to forthwith certify the Nader nomination as an independent candidate for the 2004 general election ballot." A peremptory writ will issue forthwith requiring the trial court to withdraw that order and enter judgment in favor of the Secretary of State. We will combine the writ with this court's appellate judgment. On the court's own motion, the court waives the application of ORAP 9.25, providing for petitions for reconsideration.

Combined peremptory writ and appellate judgment to issue forthwith. ORAP 9.25, providing for petitions for reconsideration, is waived on the court's own motion. ORAP 1.20(5).