Argued and submitted July 11, 2005, affirmed June 14, 2006

CITY OF MOSIER,
an Oregon municipal corporation,
*Respondent,*

*v.*

HOOD RIVER SAND, GRAVEL AND READY-MIX, INC.,
an Oregon corporation,
*Appellant.*

HOOD RIVER SAND, GRAVEL AND READY-MIX, INC.,
an Oregon corporation,
and Howard Houston,
*Counterclaim Plaintiffs,*

*v.*

CITY OF MOSIER,
an Oregon municipal corporation,
*Counterclaim Defendant.*

9800089CC; A123800

136 P3d 1160

Margaret H. Leek Leiberan argued the cause for appellant. With her on the opening brief were Case & Dusterhoff, LLP, and James H. Gidley, and Perkins Coie, LLP. On the reply brief was Margaret H. Leek Leiberan.

Daniel Kearns argued the cause for respondent. With him on the brief was Reeve Kearns PC.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

Defendant Hood River Sand, Gravel, and Ready-Mix, Inc. (HRSG), operates a quarry just outside the city limits of Mosier and accesses its quarry site by traveling over a haul road, part of which runs within city limits in an area zoned residential. Plaintiff, the City of Mosier (city), initiated a zoning enforcement action to enjoin HRSG from hauling sand and gravel over the haul road, claiming that such use violated the city's zoning ordinance. The trial court agreed with the city, declaring that defendant's use of the road was illegal under the zoning ordinance and issuing an injunction. HRSG appeals the trial court's ruling, raising multiple assignments of error. We affirm.

## I.  BACKGROUND

We begin with an overview of the facts that are not in dispute, leaving for later discussion additional or disputed facts as they become relevant to our analysis of HRSG's specific assignments of error.

HRSG operates a 28-acre sand and gravel quarry in Wasco County, immediately outside the Mosier city limits, but within the city's urban growth boundary. HRSG's predecessors had operated a quarry on the site since at least the 1950s, and its immediate predecessor had been granted a 20-year conditional use permit by the city to operate the quarry in 1972. At approximately the same time, the Oregon Department of Geology and Mineral Industries (DOGAMI) also approved a permit to operate the quarry.

To access its quarry and to haul extracted sand and gravel away from the site, HRSG uses a haul road that runs across the adjoining property, another quarry, which is owned by the State of Oregon and managed by the Oregon Department of Transportation (ODOT). HRSG uses the road with the permission of ODOT.

ODOT's quarry property consists of 70 acres of land that the state acquired by eminent domain in 1954 for a "quarry site, stock pile site, and for the construction and maintenance of a haul road, to be used in connection with the proper construction and maintenance of highways of the state highway system." Two acres of ODOT's property lie within the Mosier city limits, near its western edge, in an area that has been zoned R-10, single family residential, since 1978. The haul road runs across those two acres before it joins State Highway 30 near Interstate 84, providing access from the quarry to the public right of way. For many years, ODOT had been using the haul road to haul sand and gravel from its quarry site out to the highway, crossing the city's residential zone in the process.

In 1992, Howard Houston, the owner of HRSG, purchased a large parcel of property of which the 28-acre quarry that is at issue in this case is a part; the parcel also included a 14-acre mobile home park. That same year, HRSG applied for a conditional use permit from Wasco County to operate the quarry on the southern 28 acres of the parcel. Because the quarry lies outside city boundaries but within the urban growth boundary, land use decisions regarding the quarry property are within the authority of Wasco County, under a joint management agreement between the city and the county. That joint management agreement provides that the county has responsibility for land within the urban growth boundary until such land is annexed by the city. The county

has final decision-making authority for all land use actions affecting the urban growth area, but the county must seek "recommendations" from the city before making a decision.

In the process of reviewing HRSG's application for the conditional use permit, Wasco County sought input from the city. The city objected to the application on several grounds, including the proximity of the gravel pit to a local school and to housing, the potential for adverse effects on the water supply, and the potential for dust and noise pollution. The city, however, did not raise an objection that the use of the haul road would constitute a violation of the city zoning ordinance, nor did the city assert that it had the authority to do so. The county granted HRSG's request for a conditional use permit.

Also in 1992, HRSG applied to DOGAMI to renew its operating permit. As part of its permit approval process, DOGAMI notified the city of the application and sought its comment. In a letter to DOGAMI, the city indicated that it was "not the decision maker in this case" and that, under the joint management agreement, Wasco County was responsible for land use decisions. The letter also indicated that the city council was "very concerned" about the potential impact of the quarry and noted that the council had recommended to the county that the conditional use permit be denied.

DOGAMI ultimately granted HRSG a permit. The permit does not mention the haul road; it specifically states that its issuance does not constitute a finding of compliance with local land use laws and that HRSG must receive land use approval from local governments before using the permit.

Meanwhile, in 1996, the city initiated a zoning enforcement action against ODOT to stop it from using the haul road for hauling sand and gravel, claiming—as it does in this case—that the use of the road for hauling sand and gravel through a residential zone violated the zoning ordinance. ODOT asserted that its use of the haul road for hauling sand and gravel was a valid nonconforming use. The city held hearings and accepted evidence pertaining to the nonconforming uses on ODOT's property. Finding that mining and related hauling activity on the property had ceased for more than a one-year period, the city concluded that ODOT's

use had been discontinued and thus lost under the city zoning ordinance. ODOT appealed that decision to the Land Use Board of Appeals. LUBA affirmed the city's decision in *ODOT v. City of Mosier*, 41 Or LUBA 73 (2001). ODOT did not seek judicial review.

In 1997, Houston applied for a partition of his property to separate the 14-acre mobile home park from the 28-acre quarry. Under city land use rules, each parcel in a partition is required to have access to a public right of way. During that proceeding, the city granted Houston permission to partition the property, but, because the partition would effectively land-lock the gravel pit and prevent access to the city roads, the city required petitioner to create an easement on the 14-acre parcel that would allow legal access to the back 28 acres. The city was opposed to any quarry-related traffic coming through that direction, however. As a result, it determined that HRSG would not be able to use the easement for the hauling of rock. A plat note was added that indicated that the legal access created by the easement was "restricted to no rock hauling or heavy industrial use."

Houston's application for partition specifically stated that all rock hauling would "continue to be confined to the state owned road and pursuant to the terms of the quarry's conditional use permit." The record also indicates that the city received several assurances from HRSG and its representatives that access to the quarry operation would be confined to the haul road. A former city council member designated to testify on behalf of the city testified at deposition that the continued use of the haul road for truck traffic was a requirement for approval of the partition.

During the time that it was considering Houston's partition application, the city council received a letter from Mazeski, a local citizen who had been opposed to the quarry operation. Mazeski's letter suggested that HRSG's use of the haul road was a violation of the Mosier Zoning Ordinance (MZO). The city did not address that objection during the course of the partition proceeding, however. In May of 1997, the city approved the partition.

In 1998, HRSG completed its efforts to comply with the conditions for approval of the county's conditional use

permit and recommenced its mining operations. Shortly after that, the city brought this action to enjoin HRSG from using ODOT's haul road to haul aggregate, claiming that the hauling of sand and gravel incident to surface mining through an area zoned R-10 violated the city zoning ordinance. HRSG answered with 29 affirmative defenses and 14 counterclaims against the city.

In 2002, the trial court granted partial summary judgment in favor of the city, granting the city's request for declaratory relief and entering a preliminary injunction prohibiting HRSG from using the haul road. By that point, the trial court had disposed of many, but not all, of HRSG's affirmative defenses. On the city's motion, the trial court then agreed to bifurcate the trial; four of HRSG's remaining affirmative defenses—that HRSG's use of the property was lawfully permitted, that HRSG had a valid nonconforming use, that the city's suit was precluded, and that the city had waived enforcement of the zoning ordinance—were to be the subject of one trial, with all of HRSG's additional claims, including all its counterclaims, to be tried separately. A bench trial was conducted on the four affirmative defenses, and the trial court rejected all four. The trial court then issued a limited judgment that declared that HRSG's hauling activities on the haul road violated the MZO and that permanently enjoined HRSG from using the road for that purpose. This appeal followed.

## II. ANALYSIS

On appeal, HRSG advances seven assignments of error, which, in the interest of clarity, we divide into two categories.

In the first category are those assignments that turn on questions regarding the legality of HRSG's use of the haul road. Specifically, HRSG argues (1) that the trial court erred in concluding that hauling aggregate through the residential zone violates the MZO and (2) even if that use is a violation of the zoning ordinance, it predates the enactment of the zoning ordinance and therefore is a valid nonconforming use.

In the second category are those assignments that turn on questions about the preclusive effect of three previous proceedings involving the city and HRSG that were related to HRSG's quarry operation: (1) the 1992 proceeding in which HRSG received, over the city's objections, a conditional use permit to operate the quarry from Wasco County; (2) the 1992 application for a mining permit from DOGAMI; and (3) the 1997 partition proceeding in which the city allowed Houston to divide his larger parcel into a 14-acre mobile home park and the 28-acre quarry that is the subject of this litigation. HRSG argues that the city's participation in those prior proceedings bars it from bringing this action, on the grounds of claim and issue preclusion, waiver, estoppel, and laches.

We consider each of HRSG's assignments in turn.

A.  *The legality of HRSG's use of the haul road*

HRSG makes two distinct arguments related to the legality of its use of the haul road. First, it argues that hauling of aggregate over the haul road actually is lawful under the local zoning ordinance. Second, it claims that, even if such a use might otherwise be unlawful under the ordinance, HRSG has a valid nonconforming use.

1.  *The lawfulness of hauling aggregate on the haul road under the MZO*

At trial, HRSG asserted as an affirmative defense that hauling sand and gravel over the haul road is lawfully permitted by the MZO. In support of that defense, HRSG argued that "roads" are not subject to the local zoning restrictions of the land that they happen to cross, and therefore the city's zoning ordinance does not apply to the haul road in this case. The city responded that it does have the power to zone roads. In any event, it argued, the haul road in this case is not a public "road," but is more in the nature of an access "driveway."

The trial court agreed with the city, concluding that the haul road was a private access road, not a public street, and was therefore subject to the city's zoning authority. The trial court further concluded that the hauling of sand and

gravel as part of a gravel pit operation across a residential zone was not permitted use under the city zoning ordinance.

On appeal, HRSG argues that the trial court erred. HRSG renews its argument that its use of the haul road does not violate the MZO because roads cannot be subject to local zoning laws. According to HRSG, if roads such as public highways were subject to local government regulation, "[t]he result would be chaos and cannot have been the intent when zoning authority was given to local jurisdictions." Alternatively, HRSG argues that, even if the city has authority to regulate roads, the MZO at issue in this case has never been applied to roads before, and the city should not be permitted to selectively apply it to HRSG in this case.

We understand the parties' arguments—and the trial court's decision—to rest on a distinction between "public" and "private" roads. HRSG appears to concede that the latter are subject to local zoning laws. *See, e.g., Zippel v. Josephine County*, 128 Or App 458, 465, 876 P2d 854 (1994). Its argument is that the road at issue in this case is not a private road but, instead, is a public road that, according to HRSG, cannot plausibly be subject to local zoning regulation.

Thus framed, the issues before us are, first, whether the road at issue in this case is a "private" road. If it is, the parties agree that it is subject to local government regulation. If it is not a private road, then we must proceed to a second issue, that is, whether "public" roads are subject to the zoning authority of local governments. For the following reasons, we conclude that the trial court correctly determined that the road at issue is a "private," and not a "public," road. We therefore do not reach the question that HRSG raises about the extent to which public roads are subject to local government zoning authority.

Because the nature of this case and the relief sought are equitable in nature, we review the facts *de novo. See RealVest Corp. v. Lane County*, 196 Or App 109, 120, 100 P3d 1109 (2004) (where county brought declaratory judgment action to prevent the plaintiffs from using certain land as a driveway, the core relief sought was equitable in nature and review on appeal was *de novo*); *see also FOPPO v. Washington County*, 142 Or App 252, 257-58, 920 P2d 1141 (1996) (where

a declaratory judgment proceeding sounds in equity, the factual issues are tried *de novo*).

The parties describe the haul road very differently. On the one hand, the city characterizes it as a "gravel truck path" that "wanders" through ODOT's quarry, the location of which is not fixed to any particular location "except as indicated by two ruts in the ground." On the other hand, HRSG contends that the road has been paved for 30 years and that the road's position has been fixed in the same spot for about half a century. HRSG admits that the haul road is not open to the general public. It asserts that the road nevertheless is not a "private" road because it is on state-owned property and used for a public purpose. Thus, HRSG insists, the haul road is a public road, and public roads cannot be subject to zoning.

We agree with HRSG that the record seems to belie the city's characterization of the road as merely "two ruts in the ground" wandering over ODOT's property; the road's location has not been changed for many years, and there are several references in the record that seem to indicate that it is indeed paved.

Even assuming that the haul road is as HRSG characterizes it, however, it is still not a "public road" in any sense that is relevant to HRSG's underlying argument. Despite the fact that it runs across state-owned property, the haul road remains gated and locked at one end and is not open to public use. Moreover, there is no evidence in the record that anyone uses the road save ODOT and HRSG, or their agents, in order to access their respective quarry operations. There is no evidence that the land on which the road runs ever has been dedicated for that purpose. When the state condemned the land to establish its quarry, it listed a "haul road" as one of the uses to which the land would be put. Still, there is no evidence that the specific location of the road itself has ever been legally fixed anywhere on that property; thus, there is no dedicated right of way.

HRSG argues that, even if the city has the authority to regulate the sort of road at issue in this case, the fact remains that the city did not exercise its authority to do so. According to HRSG, the MZO does not mention the regulation of roads of any sort, public or private. HRSG advanced

the same argument to the trial court, and the trial court rejected it. We conclude that the trial court was correct in doing so.

■     We review the construction of the MZO as a matter of law. *Cf. State ex rel Currier v. Clatsop County*, 149 Or App 285, 290, 942 P2d 847 (1997) (local interpretations of land use regulations are entitled to deference only in LUBA's review of land use decisions and in our judicial review of LUBA's actions).

MZO section 2.1 provides that land within the city "may be used and a structure or part of a structure may be constructed, reconstructed, altered, occupied or used only as this ordinance shall permit." The haul road is located on land that is zoned R-10. MZO section 3.2 permits only the following uses in an R-10 zone:

"(A)   Single-family dwellings

"(B)   Public parks, public recreation areas and community or neighborhood centers

"(C)   Accessory uses and buildings customarily incidental to the above uses * * *

"(D)   Name plates and signs * * *

"(E)   Residential homes."

Finally, MZO section 9.3 provides that,

"[i]n case a building or other structure is or is proposed to be located, constructed, maintained, repaired, altered, or used, or land is or is proposed to be used, in violation of this ordinance, the building or land thus in violation shall constitute a nuisance and the City may, as an alternative to other remedies that are legally available for enforcing this ordinance, institute injunction, mandamus, abatement or other appropriate proceedings to prevent, enjoin temporarily or permanently, abate or remove the unlawful location, construction, maintenance, repair, alteration or use."

Thus, under the MZO, land may be used only as the zoning ordinance explicitly permits. Absent from the list of permitted uses in an R-10 zone is operating an aggregate mine or hauling aggregate. HRSG's use of the haul road for

the purpose of hauling sand and gravel away from its quarry thus is a violation of the zoning ordinance.

The trial court did not err in rejecting HRSG's affirmative defense that its use of the haul road is lawfully permitted.

## 2. *Existence of a nonconforming use*

HRSG argues that, even if its use of the haul road to haul sand and gravel might otherwise violate the MZO, that use remains lawful as a nonconforming use. A nonconforming use refers to one that was lawful before a zoning ordinance was enacted and that, as a result, may be maintained afterwards, even though it does not comply with the ordinance. *Polk County v. Martin*, 292 Or 69, 74, 636 P2d 952 (1981). Once established, however, a nonconforming use can be lost if it is abandoned or discontinued for a sufficiently long time. *See, e.g., Tigard Sand and Gravel, Inc. v. Clackamas County*, 149 Or App 417, 420, 943 P2d 1106, *adh'd to on recons*, 151 Or App 16, 949 P2d 1225 (1997), *rev den*, 327 Or 83 (1998).

In this case, the zoning ordinance that the city is attempting to enforce was established in 1978. As we have noted, HRSG began operations in 1992, but the quarry had been operating at the site since at least the 1950s. Both ODOT and the previous owners of HRSG's quarry property had engaged in quarry activity and used the haul road before Houston purchased the property. Based on that evidence, HRSG argued at trial that the quarry activity that took place at the site before the zoning ordinance was enacted established a nonconforming use, which use HRSG has continued since it began its operations in 1992.

The city argued at trial that, even if HRSG did establish the existence of a nonconforming use, the fact remains that HRSG abandoned it when it ceased mining operations for six years, from 1992 to 1998. In support of that argument, the city relied on its local zoning ordinance, MZO section 6.1(2), which provides that the right to a nonconforming use is lost if the "use is discontinued for a period of one year."

HRSG responded that the correct legal standard is not the city's nonconforming use ordinance, but a state statute, ORS 215.130(7)(b), which provides that, for the purpose of establishing a nonconforming use, a surface mining operation is not considered abandoned or discontinued unless it is inactive for a period of 12 consecutive years.

The trial court rejected HRSG's claim that ORS 215.130 is applicable in this case. The court held that ORS 215.130 applies to county nonconforming use ordinances, but not to city ordinances. The court then found that HRSG had discontinued use of the haul road for longer than one year and that, under the MZO, whatever nonconforming use HRSG may have had was lost.

On appeal, HRSG argues that the trial court erred in failing to apply ORS 215.130. In the alternative, it argues that it was entitled to prevail even under the local zoning ordinance. According to HRSG, even though it was not engaged in surface mining between 1992 and 1998, it was actively and continuously working to meet requirements of its permits during that period. Consequently, HRSG argues, it never "discontinued" its use of the mine and the haul road, even under the city's one-year standard. The city responds that the trial court correctly applied the one-year standard required by the MZO and that, under that standard, HRSG lost any nonconforming use to which it might have been entitled. The city further argues that, even if HRSG did not lose the nonconforming use by interruption or abandonment, it did by virtue of the fact that ODOT lost the right to use the haul road, and HRSG's "right" to use the road for that purpose is derivative of ODOT's.

a. The applicable legal standard

■ We begin with the question of the applicable legal standard. As we have noted, there are two possibilities: The first possibility is MZO section 6.1, which provides, in relevant part:

"SECTION 6.1   NONCONFORMING USES.

"(1)   A nonconforming use or structure may be continued but may not be altered or expanded. * * *

"(2)   If a nonconforming use is discontinued for *one year*, further use of the property shall conform to this ordinance."

(Emphasis added.) The second possibility is ORS 215.130, specifically ORS 215.130(5) and (7), which provide:

"(5)   The lawful use of any building, structure or land at the time of the enactment or amendment of any zoning ordinance or regulation may be continued. Alteration of any such use may be permitted subject to subsection (9) of this section. Alteration of any such use shall be permitted when necessary to comply with any lawful requirement for alteration in the use. Except as provided in ORS 215.215, a county shall not place conditions upon the continuation or alteration of a use described under this subsection when necessary to comply with state or local health or safety requirements, or to maintain in good repair the existing structures associated with the use. A change of ownership or occupancy shall be permitted.

"* * * * *

"(7)(a)   Any use described in subsection (5) may not be resumed after a period of interruption or abandonment unless the resumed use conforms with the requirements of zoning ordinances or regulations applicable at the time of the proposed resumption.

"(b)   Notwithstanding any local ordinance, a surface mining use continued under subsection (5) of this section shall not be deemed to be interrupted or abandoned for any period after July 1, 1972, provided:

"(A)   The owner or operator was issued and continuously renewed a state or local surface mining permit, or received and maintained a state or local exemption from surface mining regulation; and

"(B)   The surface mining use was not inactive for a period of *12 consecutive years or more*.

"(c)   For purposes of this subsection, 'inactive' means no aggregate materials were excavated, crushed, removed, stockpiled or sold by the owner or operator of the surface mine."

(Emphasis added.)

According to HRSG, ORS 215.130—a state statute that regulates nonconforming uses—necessarily supersedes MZO section 6.1—a local ordinance that purports to do the same thing. The city argues that ORS 215.130 does not supersede MZO section 6.1, because ORS 215.130 applies only to *county* zoning ordinances, and not to city zoning ordinances. According to the city, because there is no state law governing the regulation of nonconforming uses by cities, the MZO governs in this case, and thus whatever nonconforming use HRSG may have had on the haul road was lost because HRSG's use was interrupted for more than one year. We agree with the city.

Whether ORS 215.130 applies in this case is a question of legislative intent. We therefore apply the familiar interpretive principles set forth by the Supreme Court in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We begin by examining the text of the statute in context. If the statute remains ambiguous after that examination, we turn to the legislative history and relevant canons of statutory construction. *Id.*

In isolation, there are portions of the text of ORS 215.130 that support HRSG's interpretation. ORS 215.130(5) establishes that a lawful use at the time of the enactment of "any zoning ordinance" may continue. Moreover, ORS 215.130(7)(b) provides that the 12-year standard for interruption or abandonment applies "notwithstanding any local ordinance."

We do not read statutory phrases in such isolation, however. *Vsetecka v. Safeway Stores, Inc.*, 337 Or 502, 508, 98 P3d 1116 (2004) ("[T]ext should not be read in isolation but must be considered in context."). The text of a statute always must be read in context, which includes—among other things—other provisions of the same statute, *Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004), as well as other related statutes, *State v. Carr*, 319 Or 408, 411-12, 877 P2d 1192 (1994). In this case, the context in which those selected phrases appear make clear that they apply to counties only, and not to cities.

The immediate context of the phrases on which HRSG relies demonstrates that the subject of the section is

the authority of *counties* to regulate nonconforming uses. Subsection (2) of ORS 215.130, for example, pertains to ordinances "designed to carry out a county comprehensive plan." Subsection (3) similarly pertains to the authority of counties to regulate areas "disincorporate[d]" from the jurisdiction of cities. Subsection (4) governs "[c]ounty ordinances designed to implement a county comprehensive plan." More to the point of this case, subsection (5) provides that uses of land that are lawful at the time of enactment of a zoning ordinance or regulation may be continued and that "a county shall not place conditions upon the continuation or alteration" of such uses except as permitted elsewhere in the statute. Subsection (8), which concerns proposals for verification or alteration of nonconforming uses, provides that an "initial decision by the county or its designate on a proposal for the alteration of a use described in subsection (5) of this section" is to be made as an administrative decision without public hearings. Subsection (10) does refer more broadly to the authority of "[a] local government" to implement the procedures of the section. However, there immediately follows paragraph (a), which pertains more specifically to the authority of "a county [to] adopt procedures" to establish nonconforming uses. Subsection (11) likewise provides that "[f]or the purposes of verifying a use under subsection (5) of this section, a county may not require an applicant for verification to prove the existence, continuity, nature and extent of the use for a period exceeding 20 years immediately preceding the date of application."

Examination of the larger context in which ORS 215.130 exists makes clear that its references to counties—and not to cities or other local government entities—was not inadvertent. ORS chapter 197 establishes a general policy of land use planning throughout the state and clearly applies to both cities and counties. *See, e.g.*, ORS 197.005 (indicating that city and county governments are responsible for the development of local comprehensive plans); ORS 197.015 (defining "local government" for purposes of chapter 197 as any city, county, or metropolitan service district).

The legislature then enacted two sets of statutes that pertain more specifically to the authority of counties and cities, respectively. ORS chapter 215 comprises the land use

planning laws that are applicable to counties. *See Tatum v. Clackamas County*, 19 Or App 770, 775, 529 P2d 393 (1974), *overruled on other grounds by Allison v. Washington County*, 24 Or App 571, 548 P2d 188 (1976) ("ORS chapter 215 is an organic act authorizing any county in Oregon to undertake land use planning and zoning. The act spells out in great detail the steps a county must follow if it wishes to avail itself of this legislative grant of power * * *."). Thus, ORS 215.130 is preceded in chapter 215 by laws pertaining to county planning, for example, laws that grant authority to the governing body of a county to establish a county planning commission, ORS 215.020; that describe the membership of the county planning commission, ORS 215.030; that require the county planning commission to appoint a planning director, ORS 215.042; that require the county to adopt a comprehensive plan and zoning, ORS 215.050; and that set out various requirements for the county planning commission, ORS 215.060 to 215.110.

A parallel chapter, ORS chapter 227, comprises the land use planning laws that apply to cities. Thus, for example, laws in chapter 227 grant authority for cities to create a city planning commission, ORS 227.020; explain the composition, powers, and duties of the city planning commission, ORS 227.030 and ORS 227.090; and establish certain requirements for city planning and zoning hearings, ORS 227.160 to 227.187.

Some provisions are mirrored in both chapters. For example, ORS 215.044 and ORS 227.190 are identically worded statutes regarding solar access ordinances; the former applies only to counties while the latter applies only to cities. Similarly, ORS 215.437 authorizes the filing of a petition for a writ of mandamus "[i]f the governing body of a county or its designee" fails to take action on a permit within a specified period of time, while ORS 227.182 authorizes in identical terms the filing of a petition for a writ of mandamus "[i]f the governing body of a city or its designee" fails to act within the specified period of time.

Other provisions, however, appear in one chapter, but not the other. ORS 215.130 is one such provision. It

appears in chapter 215, pertaining to the authority of counties, but it has no counterpart in chapter 227. In the context of the larger structure of the land use statutes, the decision to include a provision concerning the authority of counties to regulate nonconforming uses but to omit a similar provision concerning the authority of cities thus appears quite intentional. *See Fisher Broadcasting, Inc. v. Dept. of Rev.*, 321 Or 341, 353, 898 P2d 1333 (1995) (including a provision in one statute, while omitting it from another, suggests that the omission was intentional).

Any residual doubt about the matter is eliminated by reference to prior versions of ORS 215.130. *Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994) ("[C]hanges adopted from session to session are a part of context of the present version of the statute being construed."). The nonconforming use law that eventually became ORS 215.130(5) first appeared in Oregon Compiled Laws Annotated, section 86-1106 (1947). That law described the authority of county planning commissions:

> "The commission may, for the benefit and welfare of the county, prepare and submit to the governing body of the county drafts of ordinances for the purpose of carrying out the development pattern, or any part thereof, previously adopted by the commission, including zoning or land use regulations. * * * [A]ny ordinance adopted under the provisions of the act shall be a local law within the meaning of section 82-201 * * * and * * * [e]xisting nonconforming uses may be continued although not in conformity with such zoning regulations."

There is no question that this early version of the law applied only to counties: the reference to "such zoning regulations" clearly refers back to the beginning of the section to zoning ordinances adopted by the county commission through the authority granted by that act. ORS 215.130 has been amended several times over the years, but it has always remained in the chapter relating to county planning, among provisions that detail the authority of a county planning commission to create ordinances related to land use and zoning.

Legislative history further supports what we have concluded from our textual analysis. ORS 215.130(7)(b)—the

portion of the statute that provides that surface mining operations are deemed interrupted or abandoned only after 12 years of interruption or abandonment—was originally introduced at the behest of the Oregon Concrete Aggregate Producers Association (OCAPA) as House Bill 2419 during the 1999 legislative session. The bill was crafted in response to this court's decision in *Tigard Sand and Gravel*. In that case, we affirmed a LUBA decision that a nonconforming use held by a Tigard quarry had been lost after it had been interrupted for more than two years. 149 Or App at 423-24. Representatives of the gravel industry were concerned that the decision did not adequately take into account the cyclical and sporadic nature of gravel operations. HB 2419 was thus written to expand to 12 years the period of inactivity before a nonconforming use of a gravel pit would be lost.

In describing HB 2419 to the House Committee on Water and Environment, the managing director of OCAPA, Rich Angstrom, explained how the bill would affect nonconforming uses on county property, and then specifically addressed the fact that the law as written would not apply to gravel operations that were on city property: "*We at this point have left the cities out*. Because they really, they don't have a nonconforming statute. * * * From at least my discussion with our attorneys, and the people involved, I don't think the cities have an issue." Tape Recording, House Committee on Water and Environment, HB 2419, Jan 20, 1999, Tape 6, Side B (statement of Rich Angstrom) (emphasis added).

We conclude that ORS 215.130(7)(b) applies to counties, not cities. The applicable legal standard in this case, therefore, is MZO section 6.1. Hence, if HRSG's nonconforming use was discontinued for a period of at least one year, that nonconforming use was lost.

    b.    Whether the nonconforming use was discontinued for one year

We turn to the question whether HRSG's nonconforming use—that is, its use of the haul road—was discontinued for longer than one year. The city contends that HRSG

obtained the property in 1992, but did not begin mining operations until 1998 and that, in the interim, HRSG had discontinued any mining operations on the site and completely abandoned any use of the haul road to haul aggregate.

HRSG concedes that it was not engaged in surface mining nor was it moving aggregate over the haul road between 1992 to 1998. It nevertheless argues that it did not abandon the use of the road during that time. According to HRSG, during that six-year period, it attempted to complete the substantial work that was required to meet the permit conditions required by the county and by DOGAMI before mining could begin. HRSG points out that, between 1992 and 1998, it spent more than $300,000 preparing the site for development in order to comply with the requirement permits. HRSG asserts that preparing the site to come into compliance with its permit obligations is itself a mining operation, and one that required frequent use of the haul road, and thus the period during which those activities were ongoing cannot be considered a lapse of its nonconforming use.

This case thus raises the issue of what it means for a nonconforming use—in particular, one related to the operation of a quarry—to be "discontinued." Two decisions inform our analysis of that issue.

The first case is *Polk County v. Martin*, 292 Or 69, 636 P2d 952 (1981), in which the Supreme Court recognized that quarry operations were, by their nature, intermittent, and that sporadic use of a quarry may be enough to maintain a nonconforming use. *Martin* involved a quarry that had been used off and on for the mining and sale of gravel for decades before a zoning ordinance came into place. During the period of alleged "inactivity," rock was continuously stockpiled on the land, sales of rock still took place occasionally, and rock was occasionally quarried. Use of the site was therefore sporadic, but within the fluctuation expected in the gravel business. The Supreme Court noted that the period of alleged inactivity essentially mirrored the activity that had taken place in the quarry before the ordinance, and both were consistent with an ongoing quarrying business. 292 Or at 78-80.

The second case is one that we have already mentioned in another context, *Tigard Sand and Gravel*. In that case, we affirmed a determination by LUBA that a Tigard rock quarry operation's nonconforming use had been lost due to interruption and abandonment. In *Tigard Sand and Gravel*, the quarry had become a nonconforming use after a zoning ordinance was applied to its property in 1973. The quarry operation continued as a nonconforming use for several years, but from 1984 to 1991 no rock crushing or quarrying activity took place on the site at all. There were some existing stockpiles of crushed aggregate, but the site did not remain open for sale of that material, with the exception of some minor sales that occurred on a small number of occasions "but such sales were of small quantity, and were incidental in nature." 149 Or App at 419. Between 1989 and 1991 the use of the property was converted to the sale of firewood. *Id.*

On appeal, the petitioner argued that the relative inactivity in operations was due to the fluctuating production inherent in the aggregate business and that, under *Martin*, that inactivity did not amount to a discontinuance of its nonconforming use. We rejected that argument, explaining that inherent fluctuations in production could not explain seven years of inactivity at the petitioner's quarry. Unlike the operations in *Martin*, which had been "sporadic and intermittent," the operations in *Tigard Sand and Gravel*, we concluded, had ceased altogether. 149 Or App at 423-24.

This case is more like *Tigard Sand and Gravel* than *Martin*. There is no evidence that, between 1992 and 1998, HRSG maintained an ongoing quarry business. There was no crushing and removal of gravel, no stockpiling on the site, no sales of gravel of any sort. HRSG's surface mining operation, therefore, cannot be characterized as even "sporadic" or "fluctuating"; the quarry had shut down entirely and was not operating, and HRSG did not use the haul road for hauling aggregate for six years.

There is some evidence that HRSG took some actions over the course of that period relating to the preparation of its own property for the continuation of mining operations sometime in the future. The extent of those actions is

not entirely clear, however. HRSG asserts that various surveyors, geologists, engineers, and other consultants were traveling to the quarry site during the period between 1992 and 1998 and that they came to the site to perform an extensive list of tasks, from creating a slope stability report and final development site plan to geographic mapping of the site, a surface water drainage plan, and the like. According to HRSG, those experts, consultants, and workers used the road to get to and from the quarry site, and that use should be regarded as sufficiently related to the mining operations to qualify as "continuing" the use of the road for the purposes of perpetuating the nonconforming use.

Even assuming for the sake of argument that such use might suffice, the evidence does not support HRSG's contention that the use was not discontinued for at least a year.

The evidence that work continued consists largely of a set of invoices from a Portland consulting firm that are dated during the relevant period. The invoices themselves contain little specific information beyond the general description "quarry development." There are, for example, two invoices from 1992, for a total of 32.5 hours of undetailed "professional services." There are four invoices from 1993, which seem to reflect a total of approximately 80 hours of labor for further, undetailed, "professional services." There are four more invoices reflecting work done in 1994, the last one dated in June 1994. Those do describe some "drilling work," "slope stability analysis," and the like. The invoices total approximately $13,000 for the entire year's work. There is then almost a two-year gap before the next invoice, dated April 1996. There is also an affidavit of Houston to the effect that over half of the expenses on the project did not occur until 1998.

Thus, at best, the evidence shows that some sort of work was carried out intermittently—with at least one two-year gap—during the six-year period from 1992 to 1998. There is no explanation for the gap and no explanation as to why it took six years to do the work that was accomplished.

HRSG also argues that there is evidence that ODOT continued to use the haul road until 1996, even if HRSG did not. In that regard, HRSG simply takes issue with the city's

findings to the contrary in ODOT's litigation concerning the vitality of its own nonconforming use, *City of Mosier*, 41 Or LUBA at 75, of which ODOT did not seek judicial review. In any event, HRSG does not explain—and we do not understand—how *someone else's* use of the road counts in evaluating whether HRSG discontinued the nonconforming use. Moreover, ODOT's use of the haul road to haul aggregate ceased as of 1996, and HRSG's use of the road did not recommence until two years later.

HRSG also relies on a remark in the minutes of a city council meeting that took place in June 1998 that "there has been activity in the pit" and on a letter from the city attorney earlier that year complaining about HRSG's renewed mining operations that year. No one disputes HRSG's resumption of mining activity in 1998, however. The evidence on which it relies does not address whether it had discontinued the use of the haul road *before* that.

In short, the evidence simply does not support HRSG's contention that it did not discontinue its use of the haul road on ODOT's property for hauling aggregate for at least a year. The trial court therefore did not err in concluding that HRSG had discontinued any nonconforming use that it may have had in the haul road. Because we reach that conclusion, we need not address the city's alternative argument that, even if HRSG had not itself discontinued the use of the road, the fact that ODOT did is fatal to the claim that a valid nonconforming use continues.

B. *The effect of prior legal proceedings regarding the quarry and the haul road*

HRSG's remaining assignments of error involve the alleged preclusive effect of certain earlier proceedings. As we have noted, there are three proceedings that HRSG contends have preclusive effect in some way: the 1992 proceeding in which HRSG obtained a conditional use permit from the county to operate the quarry, the 1992 mining permit from DOGAMI, and the 1997 partition proceeding in which the city permitted Houston to divide his parcel into separate parcels for a mobile home park and the quarry operation. According to HRSG, because of the city's participation in each of those proceedings, it is barred under the doctrines of claim

and issue preclusion, waiver, estoppel, and laches from bringing its claims in this case. The trial court rejected each of those defenses, and HRSG assigns error to the trial court's decisions in that regard. We consider each in turn, concluding that the trial court did not err.

### 1. *Preclusion by former adjudication*

HRSG assigns error to the trial court's rejection of the affirmative defense of preclusion by former adjudication. HRSG argues that both issue and claim preclusion are applicable in this case.

### a. Claim preclusion

■■ As a preliminary matter, we note that claim preclusion applies only to claims over which the former tribunal had jurisdiction. *Long v. Storms*, 50 Or App 39, 46-47, 622 P2d 731 (1981) (*res judicata* does not apply to matters over which the original court did not have jurisdiction). In this case, neither Wasco County nor DOGAMI had jurisdiction to enforce the city's zoning ordinance on city property. In general, a city has the exclusive authority for zoning within city limits unless a city ordinance provides otherwise. *See* ORS 215.130(2). The joint management agreement between the city and the county did not give Wasco County the authority to make decisions within Mosier's city limits. *See City of Mosier*, 41 Or LUBA at 84 (affirming city's enforcement of the zoning ordinance over the haul road). In their respective permit proceedings, Wasco County and DOGAMI were considering for approval HRSG's use of its quarry property that lay outside the city limits, in the urban growth boundary, not HRSG's use of the haul road. The record shows that both the county and DOGAMI were aware of HRSG's use of the haul road to access the property, but neither held itself out as having jurisdiction to approve or deny use of the haul road within city property. (Indeed, there is no indication that either the county or DOGAMI even considered the question whether such use was allowed under the city zoning ordinance.)

■ That leaves only the 1997 partition hearing as potentially relevant to the question of claim preclusion. Under the doctrine of claim preclusion,

> " '[A] plaintiff who has prosecuted one action against a defendant through to a final judgment * * * is barred[, *i.e.*, precluded] * * * from prosecuting another action against the same defendant where the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks a remedy additional or alternative to the one sought earlier, and is of such a nature as could have been joined in the first action.' "

*Drews v. EBI Companies*, 310 Or 134, 140, 795 P2d 531 (1990) (quoting *Rennie v. Freeway Transport*, 294 Or 319, 323, 656 P2d 919 (1982)). In considering the earlier proceeding, our focus is not on whether a particular legal issue could have been raised, but rather whether a claim could have been joined. *Johnson v. SAIF*, 202 Or App 264, 299, 122 P3d 66 (2005).

In this case, we do not understand how the city's response to Houston's 1997 partition application has the claim preclusive effect that HRSG suggests. To begin with, the partition approval process is not a case in which the city "prosecuted an action" against HRSG through to a final judgment. It was an administrative hearing in which Houston asked for and received permission from the city to partition his property and in which HRSG agreed to create an easement providing access to the quarry property over which hauling traffic was not allowed. Even if we were willing to construe the partition approval proceeding as a previous action against HRSG, the factual transaction that was in issue there was whether HRSG would be allowed to partition his property, not whether HRSG could use the haul road. The only property affected by the partition proceeding was Houston's 42-acre lot. ODOT's land and its haul road were not at issue. HRSG's use of the haul road was at best, tangentially related to the proceedings; nor could the city have "joined" a zoning enforcement action as part of the partition approval process. Claim preclusion is simply not apposite.

b. Issue preclusion

Equally unavailing is HRSG's assertion of issue preclusion. Issue preclusion applies only when the issue was essential to the decision in the prior proceeding. *Chavez v. Boise Cascade Corp.*, 307 Or 632, 637, 772 P2d 409 (1989). In

*Nelson v. Emerald People's Utility District*, 318 Or 99, 104, 862 P2d 1293 (1993), the Supreme Court said that each of the following must be demonstrated for issue preclusion to apply:

"1. The issue in the two proceedings is identical.

"2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.

"3. The party sought to be precluded has had a full and fair opportunity to be heard on that issue.

"4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding.

"5. The prior proceeding was the type of proceeding to which this court will give preclusive effect."

(Citations omitted.)

In this case, there is no evidence in the record that, in either the conditional use permit proceeding or the DOGAMI permit proceeding, the issue whether HRSG's use of the haul road complied with the MZO even was raised, much less "actually litigated." As for the 1997 partition proceedings, the record reflects that the question whether HRSG's use of the road violated the city zoning ordinance was broached in a letter to the city council, but there is no indication that the city pursued the question at all in that proceeding. The legitimacy of HRSG's use of the haul road under the zoning ordinance thus was not an issue "essential" to the city's decision to grant HRSG a partition. Indeed, it was because the city recognized that HRSG actually had no legal right to use the haul road that the city required the reservation of a legal right of way as a condition of its partition approval.

HRSG argues repeatedly that the city "required" him to use the haul road. The city denies that it required HRSG to use the haul road as part of its partition approval, and the city denies that the question of how HRSG would eventually access its quarry operation was even before the city council when it approved the partition. Even if it were true that the city allowed the partition only on the condition that HRSG use the haul road for hauling sand and gravel, however, that

does not show that the legitimacy of the use of the haul road *vis-à-vis* the zoning ordinance was litigated or that a decision on that issue was essential to the city's ultimate decision. The record does not establish that the legitimacy of HRSG's use of the haul road under the zoning ordinance had any bearing whatever on the city's decision to grant HRSG's requested partition. It certainly does not show that the issue whether the city could enforce its zoning ordinance and enjoin HRSG from hauling rock over the haul road was "actually litigated."

2. *Waiver and estoppel*

HRSG also assigns error to the trial court's rejection of its affirmative defenses that the city should be estopped from enforcing the zoning ordinance and that the city's actions constituted a waiver of its right to enforce the zoning ordinance. At trial, HRSG argued that the city waived enforcement by specifically requiring that HRSG use the haul road when it granted HRSG's 1997 partition application, and by not objecting when HRSG applied for its 1992 conditional use permit from the county and for its DOGAMI permit. HRSG argued that, at those proceedings, the mayor, the land use planner, and the entire city council acted uniformly to represent to HRSG, Wasco County, and DOGAMI that the city had no land use authority relevant to the quarry.

The trial court rejected HRSG's argument, finding that, as a matter of law, the defenses of estoppel and waiver were not available against a city government acting in its governmental capacity. On appeal, HRSG renews its arguments that the city has waived its right to enforce the zoning ordinance by their actions in earlier proceedings and that the city should be estopped from bringing this action. We conclude that the trial court was correct.

A party's intent to waive a right must be " 'plainly and unequivocally manifested, either in terms or by such conduct as clearly indicates an intention to renounce a known privilege or power.' " *Guardian Management, LLC v. Zamiello*, 194 Or App 524, 529, 95 P3d 1139 (2004) (quoting *Wright Schuchart Harbor v. Johnson*, 133 Or App 680, 685-86, 893 P2d 560 (1995)). In this case, nothing about the city's official actions in any of the three proceedings constitutes an explicit waiver of its zoning authority on the part of the city.

Moreover, it is well established that a local government cannot waive the requirements of the law. *See, e.g., Bankus v. City of Brookings*, 252 Or 257, 260, 449 P2d 646 (1969) ("the authorities are uniform that the mandatory requirements of an ordinance specifically stated cannot be waived"). We reject HRSG's waiver argument without further discussion and turn to the question whether the city is estopped from asserting the claims in this case.

As a general proposition, a governmental agency may be estopped from asserting a claim inconsistent with a previous position that it has taken. *See, e.g., Dept. of Transportation v. Hewett Professional Group*, 321 Or 118, 126, 895 P2d 755 (1995). There must, however, have been reasonable reliance on the governmental actor's misstatements. *Kucera v. Bradbury*, 337 Or 384, 407, 97 P3d 1191 (2004). "Reliance on a misstatement is not reasonable if the governmental actor had no authority to make the misstatement." *Id.* Thus, a city cannot be estopped by the acts of a city official who purports to waive the provisions of a mandatory ordinance. *Mannelin v. DMV*, 176 Or App 9, 13-14, 31 P3d 438 (2001).

In this case, even if it were true that city officials had represented to HRSG that the zoning ordinance would not be enforced in the R-10 zone, they would have been wholly without power to make such an assurance. Whatever the representations may have been from city officials, there is no evidence presented that any of those officials had the power to waive the enforcement of a lawful zoning ordinance. Under such circumstances, the city cannot be estopped from enforcing its ordinance.

### 3. *Laches*

In its final assignment of error, HRSG claims that the trial court erred by dismissing its affirmative defense of laches. The trial court based its dismissal of that claim on its finding that laches is "not available against the government in a suit brought to enforce a public right or protect a public interest." HRSG argues that laches is available against a municipal plaintiff, citing *City of Pendleton v. Holman*, 177 Or 532, 164 P2d 434 (1945). Again, the trial court was correct.

██ ██ HRSG's reliance on *City of Pendleton* is misplaced. When a local government is asserting a proprietary interest in property, as was the case in *City of Pendleton*, laches may be an available defense. But the Supreme Court has long said that the defense of laches is not available against a government in a suit by it to enforce a public right or protect a public interest. *Corvallis Sand & Gravel v. Land Board*, 250 Or 319, 439 P2d 575 (1968). And, in a case like this one, in which a local government brought suit to compel a party to adhere to a local land use ordinance, we held that a local government's enforcement of such an ordinance is an enforcement of a public right in protection of the public interest and that *City of Pendleton* was not applicable. *Lane County v. Oregon Bldrs.*, 44 Or App 591, 594, 606 P2d 676 (1980).

HRSG suggests that the Supreme Court has more recently abandoned the distinction between the government acting in a "proprietary" versus a "governmental" capacity. The Supreme Court certainly expressed skepticism about the utility of the distinction in *Northwest Natural Gas Co. v. City of Portland*, 300 Or 291, 297-302, 711 P2d 119 (1985). But it did not reject the distinction outright in all contexts. It merely concluded that, in the context of the city's attempt to force utilities to relocate, the distinction was unhelpful. *Id.* It certainly did not overrule *Corvallis Sand & Gravel*, and that case controls our decision here.

In this case, the city brought its suit to enforce its zoning ordinance. That represents an attempt to enforce a public right and to protect the interests of its citizens. The defense of laches is not available.

Affirmed.